UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

IN RE:

NURSES' REGISTRY AND                                      CASE NO. 15-51278
HOME HEALTH CORPORATION                                   CHAPTER 11

    DEBTOR IN POSSESSION

---

**AFFIDAVIT OF RASHONDA L. KENNEDY
IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

---

The Affiant, Rashonda L. Kennedy, after being first duly sworn, deposes and states as follows:

1. On June 26, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief with this Court under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

2. Upon commencement of this case, the Debtor is continuing to operate its business as a debtor and debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

3. My name is Rashonda L. Kennedy and I have personal knowledge of the matters stated herein and, if called upon to testify, could and would testify competently thereto.

4. I submit this Affidavit in support of the "First Day Motions" filed subsequent to the Debtor's voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code. This Affidavit describes the business of the Debtor and the developments which led to the Debtor's filing of its voluntary Chapter 11 petition.

5. I am the Chief Compliance Officer and the "Designated Corporate Representative" for Chapter 11 purposes of Nurses' Registry and Home Health Corporation (the

"Debtor" or "NRHH").  As the Chief Compliance Officer of the Debtor, I am familiar with its operations, assets and liabilities.  I have been employed with the Debtor since May 2010.

## I. BACKGROUND & OVERVIEW OF DEBTOR'S BUSINESS

6. The Debtor is a home health agency ( a "HHA") licensed by the Commonwealth of Kentucky to provide home health care services to patients in 16 counties in central Kentucky. NRHH was founded in 1984. It provides home health care services including skilled nursing, physical therapy, occupational therapy, nursing assistants, speech language pathology, and social work. As of the Petition Date, NRHH has a patient census of approximately 1350 patients.  It submits approximately 5900 claims per year (on average) to Medicare.

7. Approximately 65% of its revenues are derived from patients and services under Medicare, and averages approximately $1.3 million per month.  The Debtor is believed to be the only home health provider in central Kentucky that remains "local" – owned and operated by Kentuckians taking care of Kentuckians.

8. The sole shareholder of the Debtor has always been Lennie G. House, who served as the company's Chief Executive Officer.  Mr. House passed away on February 23, 2015.  Prior to Mr. House's death, his wife Vicki House had little to no involvement in the day-to-day operations of the company although she was an officer. Ms. House was named President following Mr. House's death.

9. The Debtor currently has approximately 200 employees, as well as a number of specialized third- party contracted service providers who serve patients acting through NRHH.

10. Lennie House was a fairly well-known person in the Lexington/Central Kentucky area. He and Mrs. House have for years been generous supporters of numerous prominent charities, and were the primary spokespersons for the Debtor in numerous television

2

advertising campaigns. From 2009 through 2014, the Debtor was one of the larger official corporate sponsors of University of Kentucky athletics. Over the years the Debtor maximized its relationships with UK athletics by having the coaches appear in television advertising spots promoting the services provided by the Debtor.

## II.     EVENTS LEADING TO THE CHAPTER 11 FILING

11. On March 18, 2008, a *qui tam* action pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., was filed in the United States District Court for the Eastern District of Kentucky by two relators, Alisia Robinson-Hill and David A. Price, Case No. 5:08-CV-145-KKC. The *qui tam* action only named the Debtor as a defendant.

12. More than three years later, on July 22, 2011, the federal government filed a Notice of Election to Intervene in Part and to Decline to Intervene in Part, pursuant to 31 U.S.C. § 3730(b)(2) and (4). The government subsequently filed its Complaint in Intervention on September 2, 2011, naming the Debtor, Lennie G. House, and Vicki S. House as defendants. The government's Complaint in Intervention, in addition to asserting causes of action under the FCA, contains claims for common law fraud, unjust enrichment, and payment by mistake. The government's Complaint covers a "relevant period" of "January 1, 2004 through 2011.

13. The Federal District Court litigation has been ongoing since 2008, and was set for trial to begin on August 2, 2015 before Judge Caldwell.

14. The allegations in the lawsuit involve theories of liability tied to the provision of non- monetary remuneration to doctors and other referral sources allegedly in violation of the Stark Law and/or the Anti-Kickback Statutes, as well as allegations of billing for services

3

provided to Medicare beneficiaries who allegedly do not qualify for the home health benefit due to no longer being homebound or in need to skilled services.

15. The allegations have been contested vigorously, and there are currently dispositive motions pending that have been filed by both sides on many of the issues involved.

16. The parties mediated the lawsuit in July 2014 but did not reach a resolution. Mr. House's passing in February 2015 added new dimensions to the litigation which have added more difficulties to reaching some resolution to move forward with any consensual resolution.

**OVERALL ECONOMIC FACTORS**

17. The universe of Medicare claims filed by the Debtor during the period January 1, 2004 through July 30, 2011 has an approximate value of $114 million. In addition to the CMS allegations that some of these are in dispute, the CMS also states that NRHH remains subject to additional ongoing investigations for time periods following 2011 and those addressed in the pending litigation.

18. On May 6, 2015, AdvanceMed notified the Debtor that CMS was suspending Medicare payments to the Debtor (the "Suspension Notice"), pursuant to the letter which is attached hereto as Exhibit A and incorporated herein by reference.

19. On May 19, 2015, the Debtor submitted a rebuttal statement to AdvanceMed (the "Rebuttal"), filed with this a true copy of which is attached as Exhibit B and incorporated herein by reference. The Rebuttal notified AdvanceMed of numerous substantive changes in personnel and management practices at the Debtor since the events relied upon as justification for the suspension.

20. On June 2, 2015, AdvanceMed notified the Debtor that CMS' suspension of Medicare payments would continue despite the information provided by the Rebuttal (the "Final Notice"), a true copy of which is attached as Exhibit C and incorporated herein by reference. The Final Notice advised the Debtor that "…no remedial measures and other specific condition(s) will justify the removal of this payment suspension" and that "The determination to continue the payment suspension is not appealable." See, Final Notice at pp. 3, 4.

21. The Debtor was not provided with any notice of or ability to contest CMS' suspension of Medicare payments prior to the Suspension Notice.

22. The Debtor has borrowed in excess of $2.0 million from the House Probate Estate but has run out of liquidity and been forced to seek chapter 11 protection for the benefit of its creditors, it patients, its employees and service providers, and to avoid disruption of critical patient services across central Kentucky.

### III. FIRST DAY REQUESTS FOR RELIEF

**A. Debtor's Expedited Motion for an Order Granting Expedited Hearing on Certain First Day Motions and Approving Shortened and Limited Notice Thereof**

23. As set forth in detail in each of the pleadings and other papers described in the Debtor's Expedited Motion for an Order Granting Expedited Hearing on Certain First Day Motions and Approving Shortened and Limited Notice Thereof (the "Expedited Hearing Motion"), the relief requested in the First Day Motions is essential to maintaining the Debtor's business and, thereby, to maximizing the value of the Debtor's assets for the benefit of its Estate and creditors.

24. Based upon the foregoing, I believe that granting the relief requested in the Expedited Hearing Motion is in the best interests of the Debtor, its creditors, and all parties in interest, and it should be granted in all respects. The Debtor cannot function at this juncture without access to funds and an immediate hearing is necessary.

**B.    Debtor's Expedited Motion for Interim Use of Cash Collateral and to Schedule Final Hearing Date and for TRO and Preliminary Injunction**

25. As set forth more fully in the Debtor's Expedited Motion for Interim Use of Cash Collateral and to Schedule Final Hearing Date (the "Cash Collateral Motion"), the Debtor needs immediate access to funds held by CMS and its administrators. The interests of the secured creditor the House Estate and of CMS that encumber the Debtor's cash collateral are being adequately protected by ongoing operations and preservation of going concern value.

26. The Debtor's use of Cash Collateral is essential to ensure that its business is able to continue operating as going concerns and, thereby, to maximize the recovery of all creditors and to assure critical patient services. Without the use of cash collateral as a means of providing working capital, the Debtor cannot satisfy its ongoing financial obligations in the ordinary course of business.

27. Based upon the foregoing, I believe that authorizing the Debtor to use cash collateral on an interim basis is in its best interest, as well as those of its creditors and all parties in interest.

**C.    Debtor's Expedited Motion for an Interim Order Regarding Adequate Assurance of Payment for Utility Services**

28. As set forth more fully in the Debtor's Expedited Motion for an Interim Order Regarding Adequate Assurance of Payment for Utility (the "Utility Motion"), the Debtor

6

currently uses electric, natural gas, heat, water, sewer, phone, and other similar utility services that are provided pursuant to the Utility Providers identified in the Utility Motion.

29. I have been advised that under federal bankruptcy law, a utility may alter, refuse, or discontinue a Chapter 11 debtor's utility services if the utility does not receive adequate "assurance of payment" from the debtor or the trustee within 30 days of the commencement of the debtor's Chapter 11 case.

30. Uninterrupted utility service is essential to the Debtor's ongoing operations and, thus, to the ultimate success of the Debtor's reorganization. The Debtor could not operate its business without continuous utility service. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor would be forced to cease operations of the affected facility or practice, which would result in a substantial loss of revenue and would jeopardize the Debtor's reorganization efforts.

31. Based upon the foregoing, I believe that authorizing the Debtor to provide adequate assurance of the Debtor's Utility Providers is in the best interests of the Debtors, its creditors, and all parties in interest, and should be granted in all respects.

**E.     Debtor's Expedited Motion for an Order to Pay and Honor Pre-Petition Wages and Related Items**

32. On the Petition Date, the Debtor filed the Expedited Motion for an Order to Pay and Honor Pre-Petition Wages and Related Items (the "Employee Obligations Motion"), which requested that the Court permit the Debtor to: (1) pay or otherwise honor prepetition wages, salaries, commissions, and other related prepetition obligations (the "Employee Obligations") owed by the Debtor to its current employees (the "Employees"), and (2) to continue various Employee Benefit Programs. I believe that the relief requested in the Employee Obligations

7

Motion is crucial because the Employees are vital to the continued operation of the Debtor's business and, ultimately, to its successful reorganization.

33. As set forth more fully in the Employee Obligations Motion, in order to retain its Employees and maintain morale, I believe that the Debtor must have authority to pay or otherwise satisfy the Employees' prepetition obligations. The amounts to be paid to Employees pursuant to the Employee Obligations Motion are reasonable, considering the Employees' importance and necessity to the Debtor's business.

34. I believe that honoring the Employee Obligations will also significantly reduce the administrative burden that might otherwise be imposed in these cases. To require the Debtor to identify the extent to which individual Employees hold priority or general unsecured claims for employee benefits and to modify benefit policies to enforce these distinctions would impose significant, additional administrative burdens and expenses that are unwarranted under the circumstances.

35. Accordingly, I believe that the Debtor should be authorized to pay the prepetition Employee Obligations in the ordinary course of business owed to the Employees as set forth in the Employee Obligation Motion and to administer of its employee benefit programs in the ordinary course of their businesses.

    **F.    Debtor's Expedited Motion for an Order Authorizing the Debtor in Possession to Maintain Prepetition Bank Accounts and to Continue to Use Existing Business Forms**

36. In the Expedited Motion for an Order Authorizing Debtor in Possession to Maintain Prepetition Bank Accounts and to Continue to Use Existing Business Forms (the "Bank Accounts Motion") filed contemporaneously herewith, the Debtor requested that the Court authorize the Debtor to continue use of its existing Bank Accounts and business forms, and order and direct the Debtor's banks to continue to honor and process all electronic and ACH transfers

on a postpetition basis. I believe that these requests are in the best interest of the Debtor, its estate and all parties in interest.

37. The Debtor has an immediate need to continue using the Bank Accounts without interruption and believe that its transition into Chapter 11 will be much more orderly and efficient, with a minimum amount of disruption and harm to its business operations, if the Bank Accounts are maintained postpetition.

38. All parties in interest will be benefited by allowing the Debtor business continuity and avoiding significant disruption and delay to payroll and daily business operations, all parties in interest will be best served by continuing to maintain the Bank Accounts. The benefit to the Debtor's estate will be considerable by eliminating the confusion that would otherwise result absent the relief requested herein.

39. If the Debtor is not permitted to maintain and utilize the current Bank Accounts and continue to use its existing business forms, it will be adversely impacted by (i) the resulting disruption to its ordinary financial affairs and business operations, (ii) the delay of the administration of its estate and (iii) the incurrence of unnecessary costs to the estate. Consequently, I believe that the Court should grant the Bank Accounts Motion.

### G. Debtor's Expedited Motion for Interim and Final Approval of Debtor's Application to Employ of DelCotto Law Group PLLC as its General Counsel Effective as of the Petition Date

40. In the Application for Order Authorizing the Approval of Debtor's Application to Employ DelCotto Law Group PLLC as its General Counsel Effective as of the Petition Date (the "DLG Application"), the Debtor requests that the Court allow it to employ DelCotto Law Group PLLC ("DelCotto") as its attorneys in its Chapter 11 bankruptcy case. As set forth more fully in the DLG Application, the Debtor has selected DelCotto as its attorneys because of the

9

Firm's extensive experience and knowledge and, in particular, its recognized expertise in the field of business reorganizations under Chapter 11 of the Bankruptcy Code.

41. Accordingly, I believe that DelCotto is both qualified and able to represent the Debtor in this Chapter 11 cases in a most efficient and timely manner and I further believe that, based on the Affidavit of Laura Day DelCotto, DelCotto does not hold or represent an interest adverse to the Debtor.

42. I have been advised by DLG that it needs to undertake extensive and critical work during the first several weeks of the case and that bankruptcy rules require 21 days' notice of employment of professionals, but that shortened notice and interim approval may be sought if to delay would cause any immediate and irreparable harm to the Estate and the Debtor. The Company needs immediate counsel services and I believe that immediate and irreparable harm will occur if the Company must wait 21 or more days for DLG to be employed and to undertake its legal services to the Debtor.

Further the Affiant sayeth naught.

/s/ Rashonda L. Kennedy
Rashonda L. Kennedy

COMMONWEALTH OF KENTUCKY )
)
COUNTY OF FAYETTE )

The foregoing was acknowledged, subscribed, and sworn to before me on June 26, 2015, by Rashonda L. Kennedy.

My commission expires:   12/17/18

/s/  Heather L. Purnell
Notary Public, State at Large, KY
Notary ID 524630

Z:\Clients\3 Engagement Pending\Nurses Registry (LDD)\Pleadings\First Day Mot Aff 20150625.doc